William D. HILL, Appellant,

v.

UNITED STATES, Appellee.

No. 10578.

District of Columbia Court of Appeals.

Argued March 10, 1977.

Decided April 9, 1979.

Stuart Stiller, Washington, D. C., appointed by this court, with whom Lawrence H. Schwartz, Washington, D. C., was on brief, for appellant.

Thomas G. Corcoran, Jr., Asst. U. S. Atty., Washington, D. C., for appellee. Earl J. Silbert, U. S. Atty., John A. Terry, E. Lawrence Barcella, Jr., and Neil A. Kaplan, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before YEAGLEY, HARRIS and MACK, Associate Judges.

PER CURIAM:

Appellant was tried and convicted on charges of first-degree murder (D.C. Code 1973, § 22–2401) and possession of a prohibited weapon (D.C. Code 1973, § 22–3214(a)). He asserts the trial court erred in permitting the government to use his post-arrest statement for the purpose of impeaching him by showing he omitted therefrom facts that were included in his trial testimony. We hold that appellant's argument equating this situation with cases holding that it is constitutionally impermissible to impeach a defendant with his post-arrest silence misconstrues the factual situation here and accordingly is without merit.

The fact that appellant shot and killed one Tyrone Grimes was not disputed at trial. The only issue before the jury was whether appellant acted in self-defense.

As part of its case-in-chief, the government presented the eyewitness testimony of Mr. Ronald Jenkins and Ms. Jean Haywood. Jenkins stated that he met and spoke with the decedent in the early afternoon of May 14, 1974. At that time, the decedent did not appear to be armed. He was wearing a shirt which was tied at his waist (thus exposing his midsection) and was not carrying anything in his hands. Thirty minutes after the two men parted company, Jenkins saw the decedent in the presence of appellant and an unidentified individual. As he continued to observe the trio, Jenkins saw appellant, standing approximately two to three feet from the decedent, raise a shotgun, aim it at the decedent, and fire it. Jenkins thought he heard two shots. Thereafter appellant ran.

On cross-examination Jenkins admitted he had initially told the police that he had not witnessed the shooting. He also spoke of furniture piled near the murder scene and admitted that he might not have been in a position to see other individuals who might have been standing behind it. He denied he had been offered anything in return for his testimony.

Jean Haywood's testimony substantially duplicated and verified that of Jenkins. She had been with Jenkins when he had seen Grimes before the shooting, and she too thought Grimes was unarmed at that time. Although she did not actually see appellant fire the shots which killed Grimes, she was nearby and her view, unlike that of Jenkins, was unobstructed. Her attention to the shooting itself was attracted by the noise of two shots. The first shot sounded like a firecracker and the second—which followed almost immediately—sounded like a loud boom. She saw Grimes lying on the ground, and she and another woman were the first to reach the body. She noticed no gun or other weapon near the body.

Cross-examination revealed that Ms. Haywood was a heroin addict and that she had not given her account of the incident to the police until three weeks after the murder. On redirect examination she explained the reason for her failure to come forward earlier was her desire "not to get involved," but that eventually she spoke with the police because she wished to dispel the rumor that the decedent had a gun at the time he was shot.

The testimony of the remaining government witnesses supported essentially the prosecutor's theory that (1) the decedent was unarmed; (2) a weapon was not discovered near the decedent's body; and (3) no more than two shots were fired.[1]

The police search of the crime scene produced a spent cartridge of the type used in a handgun.

The defense called several witnesses to testify that the decedent had a propensity toward violence. Many of these witnesses recalled threatening and disparaging remarks which the decedent had made to, and about, appellant and appellant's brother.

Two defense witnesses attempted to discredit the testimony of Ronald Jenkins. One Larry Johnson testified he had been present in a cellblock when Jenkins an-

---

1. One government witness testified that three shots were fired.

nounced that the decedent's father had offered him money to testify against appellant. Johnson also alleged that Jenkins had said the prosecutor was willing to recommend a light sentence in a pending criminal case against Jenkins [2] in exchange for his testimony against appellant.

One Vincent Wheeler also testified that he had heard Jenkins' statement that the decedent's father had offered him money to testify against appellant. Wheeler, however, recalled no reference to the prosecutor.

Ms. Debra Davis testified that although she had not witnessed the shooting, the decedent's father had offered her money and narcotics to testify against appellant.[3] She also said that approximately one hour before the incident, the decedent, who was carrying a paper bag, had asked her whether she had seen appellant and his brother—referring to the two men in profane language. Ms. Davis stated that after hearing two shots, she rushed out of her apartment and observed several men running. She also saw one man rifling through the decedent's pockets, but did not see this man remove anything. Ms. Davis was impeached by her failure to give the police the same facts she testified to at trial.

Michael Wayne Hill, appellant's brother, told the jury that on previous occasions Grimes had assaulted and threatened him, and that he had seen Grimes carry a gun. He further testified that on the day of the shooting he was at school when a classmate warned him that Grimes and some of Grimes' friends were looking for him. To avoid an altercation he took a different route home and later that same day he related the warning he had heard to his brother (appellant), who told him not to worry. Later, he, appellant and two friends were walking together on 16th Street. As the other three men continued down the street, he paused and entered a shop. While he spoke with the shopowner,

he saw Grimes walking toward the store. He turned and began to walk in the opposite direction, when he heard a shot. Someone yelled, "watch out," and he ducked behind a parked car and either heard or saw five more shots fired. Next, he saw Grimes and two other men running toward him. At that instant, appellant emerged from a nearby alley whereupon Michael Wayne Hill heard a loud blast, watched Grimes' two companions retreat, and noticed Grimes lying on the pavement. He ran off down the alley followed by appellant.

Appellant testified that he shot Grimes in self-defense. He told the jury how Grimes, who was substantially larger than either appellant or his brother, had assaulted them both in the past. He explained that on the day of the shooting he had armed himself with the shotgun because his brother told him about Grimes' latest threat. He was carrying the shotgun with him in a briefcase later on the same day while he, his brother, and two friends walked to a carry-out restaurant on 15th Street. As they approached the restaurant, he heard a shot, followed by an unidentified voice yelling "watch out." He ducked behind a tree, looked out and saw Grimes and two other men carrying handguns and running toward him. He removed his shotgun from the briefcase and when one of the men fired a shot, appellant fired both barrels at Grimes, who was only three to five feet away by then.

During cross-examination, a bench conference was called. Appellant's counsel argued that the government was pursuing a constitutionally impermissible line of questioning which would reveal to the jury appellant's failure to give his exculpatory version of the shooting to the police. The prosecutor, in turn, advised the court that appellant had not remained silent after his arrest, but after refusing to make a statement upon being advised of his *Miranda*

---

**2.** Johnson admitted that he was a codefendant in the same case and that he was aware of Jenkins' intention to testify against him at his trial.

**3.** Ms. Davis explained, however, that the decedent's father only wanted her to tell the truth.

rights[4] had later voluntarily engaged in a conversation with a Detective Dyson as the officer escorted appellant from the Metropolitan Police Department's homicide office to the cellblock.[5] The government claimed that, although appellant's story to the detective was that he had acted in self-defense, he had failed to mention some important details which he later testified to on direct examination. The prosecutor then made the following proffer:

> [A]t the very least it's offered for impeachment by omission, because the defendant never mentions at any point that there were any shots fired, never mentions at any point that Tyrone Grimes had a gun in his hand. He speaks about other people having a gun but not Tyrone. He never speaks about hearing shots fired before he fires the blast. At the very least it is impeachment by omission, which is an absolutely proper form of impeachment.

The trial court agreed with prosecutor's theory of impeachment by omission and overruled appellant's objection. Thereafter, appellant resumed the witness stand. He said he recalled having a conversation with a detective as he was being taken downstairs from the homicide squad office. Thereafter the cross-examination proceeded in pertinent part as follows:

Q. Do you recall telling him that you had been approached by Tyrone several times?

A. I believe—I don't know whether it was several times, but I told him about a couple of times that I had been approached by Tyrone.

.   .   .   .   .

Q. And do you recall telling the officer that you went downstairs with that—on May 14th, the day that Tyrone Grimes was killed, that you had received a message from Tyrone that he wanted to see you?

A. I believe so.

Q. And do you recall telling him that Michael, your brother, found a shotgun that your mother had hidden earlier?

A. I don't really know.

Q. Do you recall telling Detective Dyson, or the detective that took you downstairs, that that shotgun had changed hands on the way up to 15th Street?

A. I don't really recall that.

Q. You don't recall that?

[The witness shook his head from side to side.]

Q. Do you recall telling him that, upon approaching Tyrone . . . that you saw someone with a gun? Do you remember telling him that?

A. Well, I—I remember that, but I never approached Tyrone. He was approaching me.

Q. All right. So you don't remember telling him that it was you that approached Tyrone, and you saw someone with a gun?

A. No, I don't.

Q. Do you remember telling him that Tyrone started to run at you and, as he ran at you, you fired the weapon?

A. I might have.

Q. You might have?

[The witness nodded his head up and down.]

Q. And do you remember telling him that then you and your brother Michael Wayne Hill fled from the scene? Do you remember telling him that?

A. I don't believe I told him that.

Q. Did you ever tell him that Tyrone had a gun?

A. I don't know.

Q. You don't know whether you told him that?

A. No.

Q. Did you ever tell him that you heard any shots fired?

---

**4.** *Mrianda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**5.** The transcript of the bench conference suggests that the detective had taken no notes of his conversation with appellant but had related the conversation to a Detective Allen who summarized it in a report.

A. I believe I did.

Q. You believe you did tell him that shots were fired?

A. Uhuh.

Q. Because that would have been pretty important that shots were fired?

A. Yes, it would have.

Q. So you were talking to Detective Dyson, you would probably have told him that?

A. Well, if he asked me, I would have told him. Not voluntarily, no I wouldn't have.

Q. You would have volunteered some of this other stuff, but you might have volunteered that? [*Sic*]

A. I would have volunteered nothing, if he would never have asked me.

Q. So everything that he told you, [*sic*] as he was taking you downstairs, was because he was asking you questions?

A. Yes, it was.

Q. You just didn't volunteer any of it or just start rapping with him on the way down to the cellblock?

A. No, I didn't.

Q. Do you recall telling Detective Dyson whether or not Tyrone had a gun?

A. I don't know. I don't know.

Q. You don't know?

[The witness shook his head from side to side.]

Q. You don't remember whether you told him, is that what you are saying?

A. Right, I don't remember.

Q. Would you have considered that to be important?

A. Yes, it would have been.

Q. But if he didn't specifically ask you, you wouldn't have told him?

A. Right.

During the government's rebuttal, Detective Dyson testified as to the conversation as follows:

Q. [By the prosecutor] Let me ask you this question specifically. Did you have any conversation with him or did he explain to you at any time during the conversation how he came into possession of the sawed-off shotgun?

A. Yes, he did. It passed from his brother Michael's hands to his.

. . . . .

Q. Did you have any conversation with him or ask him anything about whether or not Tyrone Grimes had a gun or any other kind of weapon at the time of the shooting?

A. I did.

Q. And do you recall what the response to that question was?

A. He replied that he wasn't sure. He didn't know for a fact that he had a gun.

Q. Did you ask him whether or not he heard any shots being fired on May 14th?

A. No sir, he didn't.

During redirect examination appellant stated, in answer to a question by defense counsel, that he had not made a complete statement to police. Appellant claims that the aforementioned line of questioning by the prosecutor unconstitutionally impeached his testimony by calling attention to his post-arrest silence.[6]

The government, on the other hand, argued at trial and in this court that the use of appellant's post-arrest conversation with Detective Dyson was a proper form of impeachment since appellant had not remained silent and in explaining what had happened to Detective Dyson had failed to mention two material facts regarding his theory of self-defense to which he testified at trial, namely that Grimes had a gun and appellant heard shots before he fired his gun at Grimes.

Our starting point in the consideration of the legal issue raised here is the Supreme Court's recognition in *Miranda v. Arizona*,

---

**6.** Appellant did not contend at trial, nor does he here, that *Miranda* proscribes the use of all subsequent statements made after the defendant has once asserted his desire to remain si- lent. In any event, the courts have held otherwise. *Michigan v. Mosley*, 423 U.S. 96, 103, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), and cases cited in n. 9.

384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) that

it is impermissible to penalize an individual for exercising his Fifth Amendment privilege [against self-incrimination] when he is under police custodial interrogation. The prosecution may not therefore, use at trial the fact that [the individual] stood mute or claimed his privilege in the face of accusation. [*Id.* at 468 n. 37, 86 S.Ct. at 1625 n. 37.]

Later, in *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), relied on by appellant, the high court construed its *Miranda* prohibition as proscribing the government's employment of an accused's silence to impeach his exculpatory trial testimony. There, the defendant, having been arrested for robbery and advised of his *Miranda* rights, made no response to a police officer's inquiry of, "Where did you get the money?" regarding funds found on his person. At trial he explained who had given him the money. However, during cross-examination the prosecutor induced him to admit he had not offered the absolvitory statement at the time of arrest. In fact he had remained silent and made no statement at all. The Court found that this was an improper reference to the accused's right to remain silent because it invited the jury to infer that the accused's post-arrest silence rendered his trial testimony false when, in actuality, the decision to stand mute after arrest was inherently ambiguous and of dubious probative value, and was as consistent with the assertion of a constitutional right as it was with subsequent prevarication. The Supreme Court found that the probative value of Hale's pretrial silence was outweighed by the prejudicial impact of admitting it into evidence.

The Court also observed that "[i]f the Government fails to establish a threshold inconsistency between silence at the police station and later exculpatory testimony at trial, proof of silence lacks any significant probative value and must therefore be excluded." 422 U.S. at 176, 95 S.Ct. at 2136.

The Court's decision in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976),

followed its holding in *Hale*, although in *Doyle* the defendant made one remark to the arresting officer when he inquired, "What's this all about." 426 U.S. at 615 n. 5, 96 S.Ct. 2240. The Court refused to hold that this was a statement or a waiver of the right to remain silent, and held that an attempt at impeachment by reference to the arrestee's silence was constitutionally impermissible. It said

while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. [*Id.* at 618, 96 S.Ct. at 2245 (footnote omitted).]

The very essence of the Supreme Court's reasoning in *Doyle* was that:

The warnings mandated by [*Miranda*], as a prophylactic means of safeguarding Fifth Amendment rights . . . require that a person taken into custody be advised immediately that he has a right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. [*Id.* at 617, 96 S.Ct. at 2244 (footnote omitted).]

The Court thus recognized in *Doyle* that a defendant's silence after being read his rights does not necessarily indicate that he has no sufficient explanation of his conduct, since his silence might very well indicate that he is taking to heart the implied warning of the police that he should say nothing lest "anything he says may be used against him."

. The clear distinction between the facts of those two decisions with the facts here is that in both of them the defendant had

elected to assert his right to remain silent and made no statement to the police. However once an arrestee begins to explain his conduct after being informed of his right to remain silent the *Hale-Doyle* rationale falls out of the picture because he has not remained silent and an explanatory statement assuredly is not "insolubly ambiguous." By speaking he has chosen unambiguously not to assert his right to remain silent. He knows that anything he says can and will be used against him, and it is manifestly illogical to theorize that he might be choosing not to assert the right to remain silent as to part of his exculpatory story, while invoking that right as to other parts of the story. Indeed, since a statement such as Hill's was intended to be exculpatory, it would be illogical to expect him to withhold favorable facts.

Appellant talked freely about the encounter but in doing so failed to mention that he had heard gunshots or that the victim had come running toward him with a pistol in his hand. This is not the silence of one seeking the protection of the Fifth Amendment, rather it is an important omission in a statement voluntarily made. Whether it was an oversight or purposeful is for the jury to decide. In any event, his statement to police posed a threshold inconsistency with his testimony at trial and his attempt to claim that by omitting all reference to two important exculpatory facts he was merely exercising his *Miranda* right of silence was, quite understandably, found to be less than convincing by the trial court.

■ When the defendant begins voluntarily to explain his conduct it becomes clear he is not relying on his rights under *Miranda*. He may reassert the right at any point but if what he has voluntarily said is arguably inconsistent with his in-court testimony surely he is not immune from impeachment with his inconsistent or contradictory statement.

■ Whatever he said about the event, it having been given voluntarily after appropriate warnings, was admissible, *Miranda v. Arizona, supra*, 384 U.S. at 448, 86 S.Ct. 1602, and we perceive no problem in the government pointing out the lack of consistency between the statement and his trial testimony.

According to Wigmore, "a failure to assert a fact, when it would have been natural to assert it, amounts in effect to an assertion of the non-existence of the fact" and constitutes a "prima facie" inconsistency. 3A J. Wigmore, Evidence § 1042 (Chadbourne Rev. 1970).

A similar standard appears in McCormick, Evidence § 835 at 68 (2d ed. 1972): "[I]f the former statement fails to mention a material circumstance presently testified to, which it would have been natural to mention in the prior statement, the prior statement is sufficiently inconsistent." (Footnote omitted.)

■ Application of such a standard requires an individual determination in each case. The pretrial statement to be admissible for impeachment purposes should purport to address the facts surrounding the commission of the alleged offense. The prosecutor, as here, must apprise the trial court of the omitted facts to be relied upon as showing inconsistency and the court must consider whether such facts are sufficiently material that the failure to have mentioned them amounts to inconsistency. Here, where the defendant's post-arrest statement purported to relate what occurred, the prosecutor was properly permitted to show that the defendant had omitted from the version he gave the detective that he had first heard gunshots and that he had not mentioned that Grimes had a gun. In permitting the prosecutor to point out the omission in his story to Detective Dyson of two important facts, there is no criticism of or reflection on, the defendant's right of silence under *Miranda*.

■ As we have noted, the defendant may invoke his right to remain silent at any time. *Miranda v. Arizona, supra* at 475–76, 86 S.Ct. 1602. However, he may not purport to relate what happened and later claim that under *Doyle* his statement cannot be used to impeach him because it was incomplete. Its significance is for the jury

to decide. What the appellant is asserting is a right to remain silent "selectively"; that is, as to some facts and not as to others. The right to remain silent is asserted properly by doing just what the *Doyle* Court said a defendant should be able to do with the assurance that he will not be resultantly penalized, *i. e.*, remain completely silent. This Hill did not do.

In *United States v. Mitchell*, 558 F.2d 1332, 1334 (8th Cir. 1977), the trial court allowed the jury to consider evidence of the kind of "silence" we have here, noting that one accused of transporting a stolen car in interstate commerce who had voluntarily given the police an account of his reason for being on the highway would normally be expected to make some further statement or explanation upon being confronted by the police with an accusation that he had falsified the facts. The court said his failure to explain could be considered by the jury as bearing on his guilt. The circuit court upheld the trial court's ruling admitting evidence that he failed to reply to the charges. It held it was not a matter of the defendant exercising his constitutional right to remain silent as had the defendants in *Hale* and *Doyle*.

Similarly, here appellant talked voluntarily with Detective Dyson about the event and there is nothing whatever to suggest that his failure to mention certain facts supportive of self-defense, which he later testified to, was due to a decision to rely on his right to remain silent.

In the case of *Commonwealth v. West*, 312 Mass. 438, 440, 45 N.E.2d 260, 262 (1942), the court said:

> [I]t is not necessary that there should be a contradiction in plain terms. It is enough if the proffered testimony, taken as a whole, either by what it says or by what it omits to say, affords some indication that the fact was different from the testimony of the witness whom it is sought to contradict.

*See also Morgan v. Washington Trust Co.*, 105 R.I. 13, 249 A.2d 48 (1969); *O'Neill v. Minneapolis St. Ry. Co.*, 213 Minn. 514, 7 N.W.2d 665 (1942).

An omission constitutes an inconsistency "if the former statement fails to mention a material circumstance presently testified to, which it would have been natural to mention in the prior statement." McCormick, *supra* § 34 at 68. *See also* 3A Wigmore, *supra* § 1042 at 1056.

 The government's evidence here established a threshold, inconsistency (as required by the Supreme Court in *Hale, supra*), between the material omission in appellant's remarks at the police station and his later exculpatory testimony at trial. Proof of the omission of facts from his statement that would be crucial to a claim of self-defense does not lack significant probative value and therefore was admissible.

Accordingly, the judgment of the trial court is

*Affirmed.*