**Willie C. OUTLAW, Appellant**

v.

**UNITED STATES, Appellee.**

**No. 90–106.**

District of Columbia Court of Appeals.

Argued Dec. 6, 1991.
Decided March 6, 1992.

Thomas G. Ross, Riverdale, Md., appointed by the court, for appellant.

Carolyn K. Kolben, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Thomas C. Black, and Wyneva Johnson, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, and FARRELL, Associate Judge, and GALLAGHER, Senior Judge.

FARRELL, Associate Judge:

In this criminal appeal, we are compelled to reverse appellant's convictions and order a new trial because the prosecutor was allowed to impeach a defense witness with a prior, assertedly inconsistent, statement which the witness in fact did not make or adopt, and the erroneous impeachment bore directly on appellant's culpability in this essentially one-witness police identification case.

## I.

Appellant, a codefendant Anthony Wiley, and M.W. a juvenile were charged with distribution of cocaine and possessing cocaine with intent to distribute, both in violation of D.C.Code § 33–541(a)(1) (1988). Appellant and Wiley were also charged with enlisting a person under the age of eighteen to distribute cocaine, in violation of D.C.Code § 33–547(a).[1] A jury found appellant guilty on all counts. The government's evidence showed, in outline, that an undercover police officer, Victor Graves, was approached by Wiley at 22nd and Savannah Street, S.E., where Wiley asked if Officer Graves "was ... looking." When Graves said he needed "two twenties" (meaning rock cocaine at $20 per unit), Wiley replied that he could get him a "half," a "50 dollar piece," for $40. Graves agreed and the two walked a short distance until Wiley looked toward a black jeep and said, "There go my man right there." He then left and had a brief conversation with appellant, the driver of the jeep, before returning to Graves and accepting $40 from him in prerecorded funds. Minutes later the passenger of the vehicle, M.W., called Wiley over and appellant handed him a plastic bag, which Wiley gave to Graves. Wiley then passed the $40 in prerecorded police money to M.W. All three defendants were arrested a short time later. When the police took three one-dollar bills from appellant, he volunteered to the searching officer, "Is that the

---

1. Wiley pled guilty before trial to distribution of cocaine, and M.W. was adjudicated delinquent in a juvenile proceeding pursuant to his plea of guilty to possessing cocaine.

marked money from the drugs?"[2] M.W. was also searched and found to be concealing sixteen bags of rock cocaine inside his underwear. Only Officer Graves had witnessed the transfer of drugs by appellant.

Appellant testified that he was a college graduate and a partner in a construction company. He claimed he went looking for M.W. on the day in question to retrieve a calculator he had loaned him. As they arrived together at M.W.'s home to get the calculator, Wiley approached appellant's jeep and spoke with him briefly, but not about drugs. Wiley then walked away, but M.W. called him back and handed him cocaine in return for currency. Appellant claimed he immediately told M.W. to "get that stuff out of my car," after which M.W. went into his house and retrieved the calculator. As appellant was driving him back to where they originally met, the police pulled the jeep over and arrested them. According to appellant, when the police removed money from his pockets he exclaimed, "That's my money, that's not no marked money."

## II.

We first reject appellant's challenges to the sufficiency of the evidence supporting his conviction. The only issue meriting discussion is his twofold contention that the government failed to prove either the *actus reus* or the *mens rea* required for conviction under D.C.Code § 33–547(a).[3] First, appellant argues that at most the evidence showed him to be an accomplice or aider and abettor of M.W., rather than one who

"enlists, hires, contracts, or encourages" a person under age 18 to sell a controlled substance. We have not had occasion to construe this statutory language before, but it provides no support textually for appellant's claim that aiding and abetting does not suffice. The verb "encourages" employed disjunctively is a classic alternative formulation of the purposeful activity necessary to establish aiding and abetting. *See, e.g., United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938) (Learned Hand, J.) (quoting common law definitions of "aide" as including "all persons counselling, abetting, plotting, assenting, consenting or encouraging to doe the act," or "who by shewing an express Liking Approbation or Assent to another's felonious Design of committing Felony abet and encourage him to commit it").

However, even if we assume for the sake of argument that causative—in the sense of procuring—activity by the adult is essential for conviction under § 33–547, the evidence fairly permitted the jury to conclude that appellant "enlisted" M.W. in the drug activity. Appellant was the driver of the jeep and M.W. the front seat passenger. After Wiley told Officer Graves, "There go my man right there," Wiley went over and spoke with appellant, presumably about the sale of narcotics. He then returned to Graves and told him the occupants were "going to get it." The jeep remained parked, however, and minutes later M.W., inferably at the direction of appellant (since the juvenile had not talked to Wiley), called Wiley back to the jeep where

---

**2.** The three bills were not part of the prerecorded funds.

**3.** That statute provides:

(a) Any person who is 21 years of age or over and who enlists, hires, contracts, or encourages any person under 18 years of age to sell or distribute any controlled substance, in violation of § 33–541(a), for the profit or benefit of such person who enlists, hires, contracts, or encourages this criminal activity shall be punished for sale or distribution in the same manner as if that person directly sold or distributed the controlled substance.

(b) Anyone found guilty of subsection (a) of this section shall be subject to the following additional penalties:

(1) Upon a 1st conviction the party may be imprisoned for not more than 10 years, fined not more than $10,000, or both;

(2) Upon a 2nd or subsequent conviction, the party may be imprisoned for not more than 20 years, fined not more than $20,000, or both.

Appellant's contention that the government failed to prove his age as required by the offense had merit until the parties jointly provided us with a corrected certified transcript establishing that appellant was over 21 at the time of the offense.

appellant reached in front of M.W. and handed Wiley the drugs. When the pair were arrested later, the juvenile was found to be holding a stash of sixteen bags of crack cocaine inside his underwear. On these facts the jury could reasonably infer that appellant was the primary agent in the drug operation utilizing ("employing") the juvenile's services. Indeed, it was not irrational to infer that the stash was kept by M.W. precisely because of his lesser vulnerability as a juvenile to criminal punishment.

Notwithstanding this latter inference, appellant argues as well that the government failed to prove he knew M.W. was under 18 years of age. The judge correctly instructed the jury that the statute does not require that knowledge. Appellant concedes the statute contains no express requirement of this sort, and cites no legislative history implying one. Indeed, given the obvious difficulty of proving such knowledge, to impose this requirement on the government would be quite inconsistent with the legislative intent to compound punishment for those who distribute drugs to minors or employ them in distribution. *See* D.C.Code § 33–546 (punishing distribution to persons under 18; no express requirement that perpetrator know person was a minor). Not surprisingly, federal courts construing the similar federal statute punishing use of a minor to distribute drugs have also found no requirement that the defendant know the person employed was under age. *United States v. Williams*, 922 F.2d 737, 739 (11th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 258, 116 L.Ed.2d 212 (1991); *United States v. Valencia–Roldan*, 893 F.2d 1080, 1083 (9th Cir.), *cert. denied*, 495 U.S. 935, 110 S.Ct. 2181, 109 L.Ed.2d 509 (1990); *United States v. Carter*, 854 F.2d 1102, 1109 (8th Cir.1988); *see also United States v. Holland*, 258 U.S.App.D.C. 236, 244–45, 810 F.2d 1215, 1223–24, *cert. denied*, 481 U.S. 1057, 107 S.Ct. 2199, 95 L.Ed.2d 854 (1987) (statute punishing distribution of controlled

substances within 1000 feet of a school does not violate due process even though perpetrator may be unaware of school's proximity); *cf.* D.C.Code § 22–3901(c) (enhanced penalty for commission of certain offenses against person 60 years of age or older subject to statutory affirmative defense that accused knew or reasonably believed victim was not 60); *Fields v. United States*, 547 A.2d 138, 140 (D.C.1988).

### III.

We turn to appellant's argument that the trial judge erred in allowing the prosecutor to impeach M.W., called as a defense witness, with an inconsistent statement he had purportedly made at his own juvenile plea proceeding. To evaluate this argument, we must examine the record in considerable detail.

### A.

At trial M.W. testified, contrary to the testimony of Officer Graves, that it was he who had sold the drugs to Graves (with Wiley's assistance) for $40, and that appellant had had nothing to do with the transaction.[4] M.W. concluded his direct examination by admitting that at the time of his guilty plea, he had "stood before a judge of this court and told that judge about [his] involvement" in the sale. The prosecutor began cross-examination by asking immediately: "Now, at that time when you pled guilty you told the judge that Mr. Outlaw gave you the cocaine and that you gave him the marked money, didn't you?" M.W. answered, "No, I didn't." The prosecutor referred to the factual proffer read by the prosecutor (an Assistant Corporation Counsel) at the plea hearing and asked:

Q. And when he read that statement to you that day, the assistant that was in the court said that what happened, in the recitation of the facts, was that Mr. Outlaw gave you the cocaine, and you agreed to that, didn't you?

A. No.
Q. Has my client ever asked you ... if you would sell drugs for him?
A. No.

---

4. Appellant's counsel questioned M.W. in part as follows:

Q. I put the question to you ... was Willie Outlaw and you selling drugs on May 1, 1989?

A. No.

Are you telling the ladies and gentlemen of this jury that on June 22, 1989, before Judge Bowers you didn't say that?

A. No.

Q. That you didn't agree to that?

A. No.

Q. Well, you also agreed when the assistant read the proffer, that you gave the marked funds to Mr. Outlaw, didn't you?

A. No.

The prosecutor asked leave to play the tape recording of the plea proceeding to the jury, but the judge ordered that it be played first to the court and counsel (neither of whom had listened to it before) out of the jury's presence. After listening to the tape twice, the judge found that the factual proffer had included appellant's passing the drugs to M.W., but that M.W. had never been asked "to affirm whether or not Wiley first talked to Mr. Outlaw at the driver's window of the car or whether Outlaw handed something to [M.W.] who then handed it to Wiley. [M.W.] did acknowledge handing the coke to Wiley, but he wasn't asked to confirm who he received it from." Thus, while reserving decision in order to let the prosecutor listen to the tape again overnight, the court reasoned that "at the best its ambiguous and really doesn't constitute a statement one way or the other." [5]

The next day the judge confirmed that M.W. had admitted his own guilt at the plea hearing, but again found that as to representations about appellant's involvement: "at no point did the court ask [M.W.] is the statement you've just heard by the corporation counsel a true statement of what happened." M.W. had "made no statement concerning Mr. Outlaw's participation and he did not adopt the statement ... proffered by the corporation counsel." The judge therefore instructed the jury that it would not be hearing the tape recording of the plea hearing because "the

court has determined that in those proceedings [M.W.] made no statement at all one way or the other as to Mr. Outlaw's alleged involvement in the transaction."

The prosecutor resumed cross-examination and, pursuing a different tack, sought to impeach M.W.'s denial on direct examination that a 3500 block of 25th Street, S.E., the general location of the drug transaction, existed. She asked whether at the plea proceeding he had not accepted that location as the place of the sale. M.W. admitted he had. Defense counsel objected that the witness "ha[d] been tricked" because, while he admitted now that he had accepted the fact of this location, he had not been asked to do so at the plea hearing. The judge replied that "[t]he witness has now testified that he accepted what corporation counsel said. *He has adopted it.*" (Emphasis added.) To clarify the matter, however, the judge questioned M.W. further about his answer:

[M.W.], a moment ago in response to [the prosecutor's] questions, you said, yes, you accepted what the corporation counsel said concerning this incident at the time you entered your guilty plea. You recall having said that a few moments ago?

A. Yes.

THE COURT: What did you mean when you said you had accepted what he said?

A. What do you mean? Could you make yourself more clear?

THE COURT: Did you mean that you had agreed that what he said was true?

A. Yea. I wasn't really paying attention to what he was saying. I was just agreeing, trying to get out of there.

THE COURT: So you were agreeing?

A. Yea.

In apparent reliance on this colloquy, the prosecutor resumed questioning and again elicited M.W.'s denial that appellant had been involved in the sale. She then asked him three times—over strong objection—whether at the time of his guilty plea he

**5.** Accordingly, before recessing for the night, the judge told the jury that he was not sure yet whether they would be hearing the tape, because "[t]hus far from what I've heard, it appears that whatever was said it does not shed any light for purposes of our case...."

had not accepted "the fact that Mr. Outlaw handed you the packet of cocaine," each time drawing a denial from M.W.

In her initial closing argument, the prosecutor commented on M.W.'s credibility:

He testified that he pled guilty in this case and that he is on probation and that at the time [of the plea] when questioned by the government, said that he accepted the facts as they were laid out to him during his plea. Now, later on, he says when, when on recross, on redirect by counsel, well, no, no, no.

For his part, appellant's counsel referred in closing argument to the "impeachment that never happened": "there was no statement by [M.W.] one way or the other[,] which is to send [sic; say] by definition [M.W.] at his plea proceedings did not implicate . . . Mr. Outlaw." In rebuttal, the prosecutor returned to the subject and asserted that "there was an impeachment in this case and . . . just because that tape was not played, didn't mean that it didn't happen." She continued, over objection:

Let's consider what he said. When asked by the government . . . did you accept what the Assistant counsel was reading? Yes. And then . . . when asked again by the Judge, did you accept it. Yes.

Now, ladies and gentlemen, consider if you will, is it reasonable that someone would take a plea in this case, plead guilty, be placed on probation, go through a system if he didn't accept what was said in there. Is that reasonable? . . . He did not say at that proceeding no, Mr. Outlaw is not involved. He did not walk out of the door and say, no, no, no, that is not what happened. He said I want my plea today. I want my plea today. He agreed to something. The government submits do you think it is reasonable that he would go through a court system and take a plea and be placed on probation if he did not agree with what had happened? Moreover, ladies and gentlemen, now that he is on probation, he wants to help out Mr. Outlaw, the government submits to you, ladies and gentlemen. So he now says

after his case has been disposed of, oh, no, no, no, that is not what happened. The fact is not what the government would submit to you his actions indicated before.

The trial judge instructed the jury on the permissible use of inconsistent statements, citing M.W.'s testimony "that might or might not lead you [the jury] to infer that he made previous statements inconsistent with some of his testimony in this case." Later, in denying appellant's post-trial motion for a new trial on grounds that the impeachment was improper, the judge reasoned:

I'm satisfied that the attempt to impeach the Defendant was adequately based . . . on his testimony of adoption of the earlier statement.

And to the extent there wasn't [sic; was] any prejudice from the inferences to the prior testimony at the time of his plea before Judge Bowers, I think that was adequately eliminated by the Court's clear instruction to the Jury both at the time of the testimony and during final instructions that there was no statement one way or another made by [M.W.] on the subject.

### B.

■ "All courts agree that if a prior statement is received in evidence to *impeach*, it in fact must be *at variance* with the testimony of the witness." G. LILY, AN INTRODUCTION TO THE LAW OF EVIDENCE, § 83 at 303 (1978) (emphasis in original). Complete contradiction is not required, but at a minimum there must be a prior assertion of fact inconsistent with the assertion made on the stand. *See* 3A J. WIGMORE, EVIDENCE § 1040–41 (Chadbourne rev. 1970); *Martin v. United States*, 452 A.2d 360, 363 (D.C.1982) (impeachment in the absence of a "threshold inconsistency" lacks probative value). The government does not dispute the judge's finding at trial that M.W. made no affirmative statement at his plea proceeding linking appellant to the distribution. It concedes that he was not asked at the time whether he accepted or rejected the part of the factual proffer mentioning

appellant's role. Instead the government argues on appeal, as the prosecutor did to the jury, that the impeachment was proper because of M.W.'s *silence* at the plea regarding this fact—his failure to tell the judge, despite the Assistant Corporation Counsel's proffer, that appellant had not handed him the packet.[6] The government thus cites the well-settled principle that " 'a failure to assert a fact, when it would have been natural to assert it, amounts in effect to an assertion of the non-existence of the fact' and constitutes a 'prima facie' inconsistency." *Hill v. United States*, 404 A.2d 525, 531 (D.C.1979) (quoting 3A. J. WIGMORE, EVIDENCE § 1042 (Chadbourne rev. 1970)), *cert. denied*, 444 U.S. 1085, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1980); *accord*, *Walker v. United States*, 402 A.2d 424, 427 (D.C.1979). But because this rule rests upon the *non*-assertion of a fact, it carries with it a necessary safeguard which is that the omitted facts relied on must be "sufficiently material that the failure to have mentioned them amounts to inconsistency." *Hill*, 404 A.2d at 531; *accord*, *Martin*, 452 A.2d at 363.

■ We cannot conclude that M.W.'s failure to exculpate appellant when faced with the government's proffer at his own plea proceeding was an implied adoption under *Hill*. Whether or not appellant had given him the drugs was not "sufficiently material" to the issue of M.W.'s *own* culpability to permit an inference from his silence at the plea proceeding. The rule is that silence may assert the nonexistence of a fact when it would have been natural for the witness to speak to the contrary. For instance, when a speaker says something "intended to be exculpatory, it would be illogical to expect him to withhold favorable facts." *Hill*, 404 A.2d at 531. The present situation does not fit the rule. There is no reason to have expected M.W.

to exculpate appellant when the issue at the plea hearing was M.W.'s own guilt. Indeed, it is just as natural to have expected the youth to accede to the theory embodied in the prosecutor's proffer that he had played a subordinate role at the direction of appellant, the adult. It therefore is not true, in the broad sense intended by the prosecutor in her summation, that it is "[un]reasonable that [M.W.] would take a plea in this case … if he didn't accept what was said in there." No one asked him if he acknowledged appellant's complicity, and no probative inference flows from his failure to volunteer a non-material exoneration (possibly unhelpful to his cause) of this other person.

■ There remains for us to consider the trial court's finding, which the government notes but hesitates to defend on appeal, that appellant adopted the entire plea proffer retroactively, so to speak, in answer to the judge's questions at trial whether he had agreed to the proffer. The logic for this theory of inconsistency is difficult to follow; it is hard to find an impeachable inconsistency in what lay in M.W.'s mind at the plea proceeding if he failed to express that "agreement" by contemporaneous conduct. One is forced back upon the notion that, if M.W. believed appellant innocent, he would have disputed the contrary assertion in the proffer—an argument we have rejected. It is unnecessary to consider this theory further, however, because the record does not support the conclusion that at trial M.W. admitted to inconsistent statements about appellant's involvement. Following the questions by the court, M.W. steadfastly denied (on renewed cross-examination) that he had agreed to the juvenile proffer insofar as it inculpated appellant. And the record of his answers to the judge's questions, page 877, *supra*, is at best ambiguous on how much of the juvenile proffer he was (retroactively) agreeing to: the context most naturally suggests he was agreeing that the 3500 block was the

---

6. The prosecutor asked M.W. pointedly at trial, and then argued in accordance with the answer:

    Q. At the time that you entered your plea you agreed that Mr. Outlaw had given you a packet *and you didn't tell the judge at that time that, no, Mr. Outlaw didn't do that, did you?*

    A. No. [Emphasis added.]

site of the drug sale, a comparatively inconsequential admission.[7]

We cannot accept, therefore, the trial judge's alternative theory for permitting the prosecutor to resume questioning M.W. about the asserted inconsistencies in his "statements" and to argue those inconsistencies to the jury.

### C.

■ The ultimate question, then, is whether the improper impeachment of M.W. was harmless error. The familiar test [8] is whether this court "can say with fair assurance, after pondering all that has happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Hammill v. United States*, 498 A.2d 551, 554 (D.C.1985) (citations omitted). "The decisive factors are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." *Dyson v. United States*, 418 A.2d 127, 132 (D.C. 1980).

M.W. was a defense witness, *not* the defendant himself. In general, the risk of prejudice to the defendant from improper impeachment by inconsistency would seem greater if it is the defendant's own credibility that is being (unfairly) impugned. Moreover, whether it is the defendant himself or a defense witness being impeached, and whether the impeachment is valid or not, the jury normally will be told (as it was here) that the prior inconsistent statement goes only to the issue of credibility and cannot be viewed as substantive evidence of the defendant's guilt. Besides making these points, the government notes that M.W. repeatedly denied having agreed with the factual proffer incriminating ap-

pellant, and the judge instructed the jury during trial that M.W. had made no statement at the plea proceeding one way or the other about appellant's involvement.[9] For these reasons, the government contends the erroneous impeachment at most would have caused the jury to "impute[ ] some lack of candor [to M.W.]," but not enough to sway the determination of appellant's guilt.

As is often the case, the issue of harmless error here is a close and stubborn one, but we cannot agree with the government's conclusion. First, although the judge told the jury at trial that M.W. had made no statement at the plea about appellant's involvement, he allowed the prosecutor to continue her cross-examination as though the threshold inconsistency for impeachment had been established. She then asked the witness insistently whether he had not agreed with the proffer concerning appellant's guilt and, more importantly, argued at length in rebuttal summation that his failure to disavow the proffer contradicted his in-court exoneration of appellant. Nothing in the court's final charge to the jury told them this inference was improper. Thus, while the jury (looking back to the judge's earlier instruction) might have believed the tape of the guilty plea revealed nothing, the prosecutor gave them a reason, which the judge did nothing to discount, why the witness's *silence* on the tape undercut his in-court exculpation of appellant.

Furthermore, the issue on which M.W. was impeached bore directly on appellant's guilt or innocence. Either appellant had been instrumental in the drug sale (as Officer Graves testified and the guilty plea

7. That is, even if the prosecutor could properly impeach M.W. with the discrepancy about the 3500 block on the basis of his in-court "adoption," this cannot render harmless any error in impeachment with the far more telling inconsistency concerning appellant's involvement in the transaction. See part C, *infra*.

8. The government does not contend for the stronger, "plain error" test because appellant objected to the impeachment and attendant argument at all relevant points.

9. On the other hand, the government does not assert, as the judge did in denying the motion for a new trial, that the judge told the jury "during final instructions that there was no statement one way or another made by [M.W.] on the subject" at the guilty plea proceeding. The judge told the jury at that time that there was testimony "that *might or might not* lead you to infer that [M.W.] made previous statements inconsistent with some of his testimony in this case" (emphasis added).

proffer indicated) or he had no involvement (as appellant and M.W. testified). Thus the impeachment created the risk not merely that the jury would discredit a main defense witness—and hence appellant—but that they would consider M.W.'s "assent" to the proffer about appellant's role as further substantive evidence of appellant's guilt. The risk of such misuse of prior statements is present even when the impeachment is proper, but we rely on limiting instructions to neutralize it. When the impeachment is improper, though, and involves the central issue in the case, we no longer can be confident those instructions are adequate to prevent prejudice unless the evidence of guilt is overwhelming.

Here, although Officer Graves positively identified appellant as involved in the sale, Graves alone among the government witnesses actually saw the transaction.[10] And the government does not argue that appellant's explanation of his presence, which M.W. corroborated, defies or unduly taxes credibility. Thus we cannot say that the proof of appellant's guilt overwhelmed the possibility that the improper impeachment of M.W. contributed to the jury's decision to believe Graves and reject appellant's version.

For these reasons, we must reverse the convictions and remand for a new trial.

*So ordered.*

---

10. Consequently, facts having little significance in ordinary sufficiency-of-the-evidence analysis—namely, that the marked money was not found at all, and no drugs were found on appellant—acquire somewhat greater weight in the present harmless error context. The government points to appellant's post-arrest question, "Is that the marked money from the drugs?" when Graves found three one-dollar bills on his person. Appellant's version of what he said was, "That's my money, that's not no marked money." Neither version is inherently implausible. Moreover, a police officer overheard appellant say on the telephone, "They found drugs on him and locked me up."