Kevin HUNTER, Appellant,

v.

UNITED STATES, Appellee.

No. 90–1390.

District of Columbia Court of Appeals.

Argued Dec. 13, 1991.
Decided April 3, 1992.

Brian C. Plitt, Washington, D.C., appointed by the court, for appellant.

Henry K. Kopel, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Elizabeth Trosman, and James R. Costello, Jr., Washington, D.C., were on the brief, for appellee.

Before FERREN and SCHWELB, Associate Judges, and KERN, Senior Judge.

SCHWELB, Associate Judge:

On July 27, 1990, a jury convicted Hunter of unauthorized use of a motor vehicle (UUV), D.C.Code § 22–3815 (1989), but acquitted him of armed robbery and of a lesser-included ADW[1] charge arising out of the same alleged events. Hunter's principal contention on appeal from his UUV conviction[2] is that he was denied a fair trial as a result of improper prosecutorial argument. Specifically, he complains that the prosecutor violated his rights by urging the jurors not to believe his account of his contretemps with the complaining witness because he (Hunter) was relating it for the first time at trial, and because he and his attorney had failed to go to the prosecutor or the police following his indictment to apprise the government of his version of the facts. We agree with Hunter that this argument was improper in a fundamental way, but conclude that no pertinent objec-

---

1. Assault with a dangerous weapon.

2. Hunter was also convicted at the same trial of willful failure to appear for his arraignment, in violation of the Bail Reform Act, D.C.Code § 23–1327(a) (1989). The trial judge set aside this conviction on grounds unrelated to this appeal. Hunter entered a plea of guilty to carrying a pistol without a license (CPWOL), D.C.Code § 22–3204(a) (1989), a charge which was included in the same indictment, but which the trial judge severed to avoid prejudice to Hunter.

tion was made in the trial court and that Hunter has failed to make the "clear showing of a miscarriage of justice," *Adams v. United States*, 302 A.2d 232, 234 (D.C. 1973), which is required in order to secure a reversal for plain error. We also disagree with Hunter's secondary contention that, in the same portion of his closing argument, the prosecutor improperly attempted to impeach Hunter's trial testimony with a statement which Hunter made to the police shortly after his arrest. Accordingly, we affirm Hunter's conviction.

## I

### THE EVIDENCE

This is one of those cases in which the prosecution's version of events is dramatically inconsistent with the defendant's; the jury apparently believed some but not all of each side's testimony. The complaining witness, Damon Stevenson, testified that on the morning of March 14, 1989, he was driving his wife's 1985 Mercury Topaz in southeast Washington, D.C. Just after he had turned onto First Street, a car cut him off. Three men, including Hunter, jumped out of the intruding vehicle. One of the men (not Hunter) pulled Stevenson out of the driver's seat and jammed a pistol in his ribs. Hunter shouted "Now we got you," and struck Stevenson in the forehead with a yard long stick. As Stevenson was reeling from the blow, with blood running down his face, Hunter told his confederates that "[t]his isn't him. This is his brother." The man with the pistol nevertheless suggested that they take Stevenson's car, and the robbers went through Stevenson's pockets and wallet and took twelve dollars. While his two companions left in their car, Hunter took Stevenson's jacket and drove off in the Mercury Topaz. On cross-examination, the defense showed that it had taken Stevenson forty minutes to report the robbery,[3] brought out Stevenson's criminal record, and pointed to several alleged inconsistencies in his story.

Stevenson also testified that at the time of the incident he did not know Hunter by name, but had seen him in Stevenson's in-laws' neighborhood. He denied ever having been in an apartment together with Hunter and a woman named Teresa (or Tee), although he admitted knowing "Tee." Stevenson also denied that he had ever rented the car out on previous occasions in exchange for drugs or for money.

Officer Lauren Braswell testified that at about 3:20 a.m. on March 15, 1989, while he was monitoring the intersection of Southern Avenue and Wheeler Road for stolen vehicles, he saw Hunter drive through the intersection in Stevenson's car. Officer Braswell checked his list of stolen automobiles and identified the Mercury as one of them. He then radioed for assistance and followed Hunter. After other officers had responded, Officer Braswell stopped Hunter at the intersection of Southern Avenue and 30th Street. Hunter and his female passenger, Stephanie Brown, were arrested and transported to a police station, where one of the arresting officers, Ronald Fluck, processed the paperwork.

Officer Fluck testified that after his arrest, Hunter gave his name as Michael Jackson, and that Hunter initially refused to answer any questions. Subsequently, however, Hunter asked Fluck what was going to happen to Ms. Brown. Officer Fluck replied that Hunter would have to sign a waiver of rights card before Fluck could discuss the case with him. Hunter signed a waiver card, and Officer Fluck told him that Ms. Brown was also going to be charged (as indeed she was). Hunter remonstrated that Ms. Brown didn't have anything to do with it." He also asserted that he had paid a "gentleman" forty dollars for use of the car. The officer asked Hunter for the name of this "gentleman," but Hunter became quiet and said nothing. Having previously learned of the nature of Stevenson's allegations, Officer Fluck, "out of the blue," asked Hunter "what kind of a stick did you hit him with?" Hunter's response was "a broomstick." There is no indication in the record that the officer asked Hunter any more questions, or that

---

**3.** Stevenson had also originally reported to the police that he was robbed by two men rather than by three.

Hunter volunteered any further information.

Hunter took the stand on his own behalf. He testified that three or four weeks before his arrest, Stevenson had rented him the Mercury Topaz for a day for the sum of forty dollars. Before Hunter had finished using the car, however, Stevenson drove it away. Hunter related that on the day before his arrest, he ran into Stevenson again at the home of a woman named Teresa, who was then Hunter's girlfriend. Hunter testified that he and Stevenson became embroiled in a heated argument, and that during the unpleasantries he (Hunter) picked up a broom and hit Stevenson in the forehead. Hunter claimed that he later apologized and that the situation cooled down. According to Hunter, Stevenson then authorized him to use the car in consideration for the money Stevenson still owed him.

On cross-examination, the prosecutor asked Hunter whether he had revealed to the police, prior to trial, the details of his story, and whether he had disclosed where he and Stevenson were when the fracas occurred. Hunter responded that he had not. There was no objection to this inquiry.

One defense witness testified that he had rented a car from Stevenson on another occasion, and that he knew other people who had rented the Mercury. The witness also confirmed that he had seen Hunter and Stevenson at Teresa's home. A second defense witness testified that he had seen Hunter and Stevenson together at that location at two different times, and that on one of these occasions Stevenson had handed Hunter some keys in exchange for some money. The witness related that he had not heard what the two men said to each other.

## II

### THE PROSECUTOR'S COMMENT ON HUNTER'S POST–INDICTMENT SILENCE

*A. The Violation.*

■ In order to place in context Hunter's claim of improper closing argument, it is necessary to set out in full the relevant portion of the prosecutor's remarks:

PROSECUTOR: Now the indictment comes down, and we know from our own general knowledge, do we not, that indictments usually come down before the trials, and sometimes long before the trials and sometimes—

DEFENSE COUNSEL: Objection.

PROSECUTOR: —not so long before the trials.

THE COURT: It's not relevant. Let's not belabor it.

PROSECUTOR: And here we are on trial day, and Mr. Credibility [4] once again tells us this afternoon, on the last day of trial, that, oh, here's what happened. See, I hit him with the stick, but it was on 3–14–89, but it was between five and six in the evening at Teresa's house. And it was not as the Government says, at eight in the morning on March 14th; it was later, at five and six p.m. at night.

Now, here's a man charged with an indictment. At the time this indictment came down, it's got armed robbery in here, it's got BRA.

DEFENSE COUNSEL: Objection.

THE COURT: Overruled.

PROSECUTOR: And it has an unauthorized use of a vehicle count. *Here's somebody charged in an indictment by the District of Columbia grand jury, which normally you would not take lightly. You'd get yourself an able lawyer. He has an able lawyer. And, yet, he doesn't tell the Government, didn't tell the police, doesn't tell anybody, hey, you don't understand how this all came about.*

You know. We're going to wait to the last day of trial, and then we're going to tell the world. . . .

(Emphasis added).

The prosecutor's apparent point, as reflected in the italicized portion of his argu-

---

4. *Cf. Irick v. United States,* 565 A.2d 26, 35–36 (D.C.1989) ("truthteller Irick").

ment, was that after Hunter had been indicted, he and his attorney should have come to the United States Attorney's office to lay bare their defense for the prosecutor or the police. Such an argument is, to put it charitably, laden with mischief.

■ "The use for impeachment purposes of [a] petitioner's silence, at the time of arrest and after receiving *Miranda* warnings, violates the Due Process Clause of the Fourteenth [5] Amendment." *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976). Hunter did make a statement to the police at the time of his arrest, and prosecutorial comment on any inconsistency between that statement and his trial testimony is permissible. *Dixon v. United States*, 565 A.2d 72, 79–80 (D.C.1989).

In this case, however, the prosecutor's argument did not focus on any such purported inconsistency. Rather, the prosecutor asked the jury to draw an unfavorable inference as to Hunter's credibility because Hunter did not volunteer his account to the government after he had obtained the advice of counsel and *after he had been indicted.* He suggested that Hunter had not taken the indictment seriously enough. No authority has been cited to us on the precise question whether a prosecutor's negative comment on an accused's silence after he has been indicted, and after he has received the assistance of counsel, runs afoul of the constitutional doctrine articulated in *Doyle.* Although we think that the vice in what the prosecutor said in this case is as serious as that in *Doyle*, we need not reach the constitutional question, for we can readily dispose of the issue on nonconstitutional grounds. *See Olevsky v. District of Columbia*, 548 A.2d 78, 81 (D.C. 1988).

■ The Supreme Court has stated that "each jurisdiction may formulate its own rules of evidence to determine when prior silence is so inconsistent with present statements that impeachment by reference to such silence is probative." *Jenkins v. Anderson*, 447 U.S. 231, 239, 100 S.Ct.

2124, 2129, 65 L.Ed.2d 86 (1980). In the federal courts, "prior silence cannot be used for impeachment where silence is not probative of a defendant's credibility and where prejudice to the defendant might result." *Id.* at 239, 100 S.Ct. at 2129; *see also Grunewald v. United States*, 353 U.S. 391, 423–24, 77 S.Ct. 963, 983–84, 1 L.Ed.2d 931 (1957). Hunter's failure following his indictment to disclose his defense to the prosecutor was not at all probative as to his credibility. As this court pointed out in *Walker v. United States*, 402 A.2d 424, 427 (D.C.1979),

> [k]nowing that one is the focus of a criminal action serves to make one more cautious about the advisability of discussing one's defense with others than [one's] attorney. Presumably, an attorney would advise his client not to do so.

*Accord, Grunewald, supra*, 353 U.S. at 423, 77 S.Ct. at 983 ("[i]t was thus quite consistent with innocence for [Grunewald] to refuse to provide evidence which could be used by the Government in building its incriminating chain"); *People v. Conyers*, 52 N.Y.2d 454, 458, 420 N.E.2d 933, 935, 438 N.Y.S.2d 741, 743 (1981) (defendant's pretrial failure to speak to law enforcement officers is of "extremely limited probative worth" because, among other reasons, he may be aware that he is under no obligation to speak and that anything he says might later be used against him).

Moreover, the use of an accused's pretrial silence to impugn his credibility "has a significant potential for prejudice." *United States v. Hale*, 422 U.S. 171, 180, 95 S.Ct. 2133, 2138, 45 L.Ed.2d 99 (1975). This is especially true where, as here, we are dealing with post-indictment silence at a time when the accused was represented by counsel. For good or ill, criminal trials in this country are conducted pursuant to the adversary system. A litigant who can keep his own evidence under wraps until trial has an obvious tactical advantage over an adversary who has disclosed all. Discovery, and especially discovery of the defendant's case, is very limited in criminal prosecutions. See Super.Ct.Crim.R. 16. A

---

**5.** As to the District of Columbia, the Due Process    Clause is found in the Fifth Amendment.

competent attorney will ordinarily provide information about his or her client's evidence to the prosecutor only where there appears to be a reasonable probability that such disclosure will result in the dismissal of charges, a favorable plea offer, or some other tangible benefit. This is reality, known to judges and lawyers who participate in our criminal justice system.

Most jurors, on the other hand, are not schooled in the law. They are unlikely to be familiar with the intricacies of pretrial discovery in criminal cases. Not being acquainted with the perils and pitfalls of premature disclosure of one's case to one's adversary, a fair-minded juror might well perceive a good deal of common sense in an argument of the kind with which the prosecutor attempted to skewer Hunter in this case—"if he had an innocent explanation, why didn't he tell the United States Attorney and get him to dismiss the charges?" If prosecutors were allowed to make tactical hay out of a defense attorney's prudent decision not to present the government with unreciprocated impeachment materials and free discovery, the exercise of a wise and constitutionally based strategy would be severely chilled. Indeed, the pressure on defendants and their attorneys to tell all to the prosecutor in advance of trial might often be irresistible, to the prejudice of the accused's constitutional right to a fair trial. Recognizing these principles, the government commendably conceded at argument that the prosecutor's remarks in this case were impermissible. We now so hold.

### B. The Standard of Review.

In determining whether the prosecutor's argument and the trial judge's response or lack thereof require reversal of Hunter's conviction, we must first identify the applicable standard of review. If there was a sufficient and timely objection, the question is

> whether we can say with fair assurance, after all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.

*(Philip) Dyson v. United States,* 418 A.2d 127, 132 (D.C.1980). If the point was not preserved, on the other hand, we review for plain error. The defendant's burden in plain error cases is, and should be, a formidable one; we will reverse a conviction for error not complained of below only in an extreme situation in which the defendant's substantial rights were so clearly prejudiced that the very fairness and integrity of the trial was jeopardized. *See Mills v. United States,* 599 A.2d 775, 787 (D.C. 1991). A clear miscarriage of justice must be shown. *Adams, supra,* 302 A.2d at 234; *see also McGrier v. United States,* 597 A.2d 36, 41 (D.C.1991) (standard for reversal is "far more stringent" in absence of proper objection).

We conclude that the plain error standard applies. Objections must be made with reasonable specificity; the judge must be fairly apprised as to the question on which he is being asked to rule. "[P]oints not asserted with sufficient precision to indicate distinctly the party's thesis will normally be spurned on appeal." *Miller v. Avirom,* 127 U.S.App.D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967); *see also Williamson v. United States,* 445 A.2d 975, 980 n. 5 (D.C.1982). The purpose of requiring a specific objection is to enable the prosecution to respond to any contentions raised and to make it possible for the trial judge to correct the situation without jettisoning the trial. *Dixon, supra,* 565 A.2d at 80; *Adams, supra,* 302 A.2d at 234. Litigants should not be permitted to keep some of their objections in their hip pockets and to disclose them only to the appellate tribunal; "[o]ne cannot take his chance on a favorable verdict, reserving a right to impeach it if it happens to go the other way." *Palmer Constr. Co. v. Patouillet,* 42 A.2d 273, 274 (D.C.1945); *see also Hopkins v. United States,* 595 A.2d 995, 996 n. 3 (D.C.1991) (quoting *Patouillet* ).

Repeated or prolonged objections during counsel's argument to the jury may disrupt the flow of the trial and enable a boisterous lawyer to reap an advantage from his or her lack of civility. *See United States v. Briggs,* 457 F.2d 908, 911–12 (2d

Cir.1972). We have therefore relaxed, in the context of closing argument, the conventional requirement that a defendant "take his objection at the earliest possible opportunity when, by doing so he can enable the trial judge to take the most efficacious action," *id.* at 911 (citations and internal quotation marks omitted), and have held that an appropriate objection or motion at the bench at the conclusion of the prosecutor's presentation is sufficient to preserve the point for appeal. *Irick v. United States,* 565 A.2d 26, 32 n. 13 (D.C. 1989); *Hawthorne v. United States,* 476 A.2d 164, 169–70 (D.C.1984). The ultimate objection must, however, be reasonably specific. *See Irick, supra,* 565 A.2d at 34 n. 22. As Judge Friendly stated for the court in *Briggs, supra,* 457 F.2d at 912,

> even in ... extreme cases there would seem to be no reason why [counsel] should not be required to bring the matter to the judge's attention, outside the presence of the jury, at the end of the summation, so that the court can consider whether to attempt curative instructions or to declare a mistrial, *see United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 237–243 [60 S.Ct. 811, 853, 84 L.Ed. 1129] ... (1940), rather than gamble on obtaining an acquittal.

In the present case, defense counsel objected twice. See pages [142–143], *supra.* Her first objection was, in effect, sustained; the second was overruled. As the quoted portion of the transcript reveals, see page [143], *supra,* both objections were made *before* the prosecutor mentioned or implied that Hunter failed to disclose his defense to the government after being indicted. Unless Hunter's attorney was clairvoyant, she could not have been directing her objection to the prosecutor's remarks about her client's post-indictment silence, because nothing had been said about that subject at the times that she objected.[6]

Moreover, on the morning following the closing argument, defense counsel made a motion for a mistrial on two grounds; first, that the prosecutor had "shifted the burden of proof" by commenting on Hunter's failure to present certain documentation, and second, that the trial judge had inappropriately intervened during her argument on the failure to appear count. Counsel made no mention whatever of the prosecutor's comment on Hunter's post-indictment reticence. In her post-trial motion for a new trial, counsel added still further grounds, but remained silent on the issue of the prosecutor's alleged misuse of Hunter's post-indictment silence. Under these circumstances, we hold that the principal issue which Hunter presents for our consideration was not preserved in the trial court, and fashion our review accordingly.

*C. Whether There was Plain Error.*

In determining whether Hunter's conviction should be reversed, "it is our function to review the record for legal error or abuse of discretion by the trial judge, not by counsel." *Irick, supra,* 565 A.2d at 33. Applied to the present case, this means that we must decide whether the judge compromised the fundamental fairness of the trial, and permitted a clear miscarriage of justice, by not intervening, *sua sponte,* when the prosecutor made his impermissible remarks about Hunter's post-indictment failure to disclose his version of events to the government. *Id.; see also Dixon, supra,* 565 A.2d at 78.

Although the judge might well have nipped the problem in the bud by calling counsel to the bench when the prosecutor made his unorthodox argument, we cannot say that it was unreasonable for the judge not to do so. The lack of any reaction from defense counsel might have suggested that she did not perceive any prejudice, a fact which is itself suggestive in some measure of lack of prejudice. *See Parks v. United States,* 451 A.2d 591, 613 (D.C.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983). The allegedly offend-

---

6. In context, it appears that Hunter's counsel may have been concerned about the prosecutor's mention of the indictment for any reason. An indictment is not evidence; see Criminal Jury Instructions of the District of Columbia, No. 2.06 (3d ed. 1978), and Hunter's attorney may have viewed any reference to the charging document as out of bounds.

ing remarks consisted of but a few lines in a lengthy closing. Defense counsel could easily have responded to them, at the bench or in her own closing argument. The judge could thus reasonably conclude, in the absence of a defense objection, that the situation was not extreme enough to warrant his uninvited intrusion into the adversary process. "Unless the reasons for intervention are compelling, a judge generally acts within his discretion when he declines to inject himself unilaterally into the controversy or to take measures which counsel have not asked him to take." *Mack v. United States*, 570 A.2d 777, 782 (D.C. 1990).

In her own comparatively forceful closing argument, Hunter's attorney made no mention at all of the issue presently under discussion. As we have previously noted, she also demanded first a mistrial and then a new trial on other grounds, but eschewed any reliance on this one. In *Parks, supra,* this court found it significant, in holding that improper prosecutorial argument had not prejudiced the defendants, that counsel first raised the issue in a post-verdict memorandum supporting a motion for a mistrial. In the present case, Hunter first raised the issue even later, on appeal.

█ Reversal for plain error in cases of allegedly improper prosecutorial argument should be confined to situations which can fairly be characterized as "particularly egregious." *Mills, supra,* 599 A.2d at 787, quoting *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985). We view the prosecutor's argu-

ment in this case as a significant departure from permissible advocacy—a departure, indeed, that we trust will not be repeated. Nevertheless, viewing the offending remarks in the context of the case as a whole, *see Young, supra,* 470 U.S. at 15, 105 S.Ct. at 1046, we think it most unlikely that a few lines of impermissible comment, to which neither counsel nor the judge again alluded, compromised the fairness or integrity of the entire trial or threatened such a clear miscarriage of justice that the plain error doctrine may properly be invoked.

### III

### THE ALLEGED COMPARISON BETWEEN HUNTER'S PRETRIAL STATEMENT AND HIS TRIAL TESTIMONY

Hunter also secondarily contends [7] that the prosecutor's argument quoted at pages [142–143], *supra* constituted an impermissible comment to the effect that his trial testimony was inconsistent with his pretrial statement to the police, and that this too requires reversal. We disagree.

We note at the outset that it is not at all clear that the jury was ever asked to draw the inference which Hunter says was improper. In fact, the prosecutor never explicitly mentioned the earlier statement at all. The closest he came to any allusion to it was his general remark that Hunter had disclosed his version of his dealings with Stevenson for the first time in his testimony at the trial.[8]

---

7. At argument, Hunter's appellate counsel was asked whether his appeal was based on the prosecutor's reference to the lack of disclosure of his defense following the indictment or on any comparison the prosecutor may have made between Hunter's trial testimony and his statement to the police. Counsel stated that he was "mainly" relying on the comment about Hunter's post-indictment conduct but also, with considerably less emphasis, making the second claim.

8. According to our dissenting colleague, the prosecutor's argument that Hunter did not "tell the police" his ultimate version of his encounters with Stevenson was a reference to Hunter's pretrial statement to the police. Since that allu-

sion to the gendarmerie came immediately after the prosecutor's reference to Hunter's indictment, his remark that Hunter has "an able lawyer", and his complaint that Hunter "didn't tell the Government," see the italicized portion of the closing argument quoted at page 143, *supra,* the prosecutor was obviously talking about Hunter's omissions *after his indictment.*

The portion of the closing argument focusing on the rights card, cited at pages [141–142] of the dissenting opinion, came three transcript pages before the prosecutor's remark about Hunter's failure promptly to provide his version to the government and to the police. The prosecutor was then dealing with an entirely different point, namely, that Hunter gave a false name and declined to sign the rights card. Sub-

The unambiguous prime focus of that remark was on Hunter's failure to come forward with counsel after he had been indicted for serious crimes, a situation which, according to the prosecutor, would have triggered a trip by Hunter and his attorney to the prosecutor's office. Nothing that the prosecutor said was directed to the conversation between Hunter and Officer Fluck at the police station on the day of Hunter's arrest.[9] To demonstrate that his conviction should be reversed for improper prosecutorial argument, Hunter should first be required to show unambiguously that the allegedly offending argument was in fact made. We do not think that Hunter has met this threshold requirement.

But even if the prosecutor's comments could reasonably be construed as an attempt to impeach Hunter's trial testimony with an omission from his pretrial statement—and we do not think they can—Hunter's counsel never made any objection on that ground. What was at most an implicit comparison of Hunter's two accounts, made without any actual allusion to Hunter's statement to the police, cannot reasonably be regarded as jeopardizing the very fairness and integrity of the trial. *Mills, supra,* 599 A.2d at 787.

Finally, Officer Fluck's testimony as to what Hunter had said to him was received in evidence without objection. The jurors had also heard Hunter's account of the events in question. Hunter's complaint in this court, then—a secondary complaint by his own admission—is of what was at most a subdued and indirect comparison between two accounts, both of which were in the record.[10] But "[t]he government has the right during closing argument to comment on the evidence and to draw reasonable inferences from it." *Dixon, supra,* 565 A.2d at 80. We would surely be intruding on the prosecutor's argument to an unprecedented and unjustifiable degree if we were to hold that yes, he may mention the statement to the police, and yes, he may comment on the trial testimony, but if he alludes to the uncontested fact that something was in Hunter's second version but not in his first, then a new trial is required. *See Allen v. United States,* 603 A.2d 1219, 1127–1228 (1992) (en banc).

■ In *Dixon,* a case in which the prosecutor's reference to a critical omission from the accused's statement to the police was far more forceful and specific than the alleged allusion here, we did not explicitly decide whether the prosecutor was required to seek leave of court before contending in closing argument that the defendant's pretrial statement was inconsistent with her trial testimony. *Id.* at 80; *cf. Hill v. United States,* 404 A.2d 525, 531 (D.C.) (per curiam) (prosecutor must seek leave of court before impeaching criminal defendant *during cross-examination* with omissions from her pretrial statement to police), *cert. denied,* 444 U.S. 1085, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1979).[11] We emphasized in

---

sequently, the prosecutor again alluded to the rights card, this time describing what Hunter was *doing as follows: "We're going to wait to the last day of trial, and then we're going to tell the world, just like I told the world on these cards."* This is hardly a comment on any inconsistency between Hunter's account to the police and his trial testimony.

We would therefore have to engage in a "bizarre reconstruction" of the prosecutor's argument in order to accept Judge Ferren's interpretation of it. This we may not do. *See Irick, supra,* 565 A.2d at 33–34; *Mills, supra,* 599 A.2d at 784–85 n. 12.

**9.** In fact, the prosecutor did not request, nor did the court give, an instruction regarding prior inconsistent statements. It is axiomatic that we should not strain to read into a prosecutor's argument the most sinister possible meaning. *See Irick, supra,* 565 A.2d at 33–34. In the present case, what the prosecutor did say was bad enough; and we ought not to attribute to him yet another impermissible argument where there is so little indication that he made or intended to make it.

**10.** Judge Ferren appears to take the view that although Hunter's pretrial statement and pretrial testimony were both part of the record before the jury, any difference between the two was not "in evidence." This somewhat metaphysical distinction may give pause to the "earthy" reader. In any event, any reasonable juror who noticed the difference between the two versions would surely have picked it up without the prosecutor's supposed one-word reference to it in closing argument.

**11.** Judge Ferren also cites a series of decisions, in addition to *Hill,* for his thesis that the prosecutor must seek an *in camera* determination of

*Dixon,* however, that "the prosecutor's having argued that Ms. Dixon's statement and her testimony were inconsistent did not preclude defense counsel from arguing the contrary." 565 A.2d at 80 n. 15; *see also Mills, supra,* 599 A.2d at 786. We strongly implied, and now hold, that in the absence of unusual circumstances, a prosecutor should be permitted to make reasonable comments on, and comparisons between, the defendant's pretrial statement and his trial testimony, provided that the prior statement is in evidence and that the prosecutor makes no characterizations unsupported by the record. Defense counsel may, of course, request the court, by motion *in limine,* to make a threshold determination whether a potential argument by the prosecutor regarding an omission from the pretrial statement would create an inconsistency when none exists.[12] The prosecutor should not be precluded from making such a comparison, however, unless the judge determines that an impartial juror could not rationally find the two statements to be inconsistent with one another.[13]

■ We recently observed in our en banc opinion in *Allen, supra,* at 1227, quoting Judge Learned Hand[14] and Professor McCormick,[15] that jurors are "quite capable of detecting prosecutorial non sequiturs,"

and that the most appropriate remedy for an illogical argument by counsel is usually "the answering argument and the jury's good sense." *See also Mills, supra,* 599 A.2d at 786. Assuming that the prosecutor was indeed comparing Hunter's trial testimony and his pretrial statement and asking the jurors to find an inconsistency, and assuming further that a case could be made for the proposition that there was no such inconsistency, the defense attorney was in a position to expose the weakness of the prosecutor's position and put the government on the losing side of the debate, thus promoting her client's chances of acquittal. Robust response by counsel to a weak argument, rather than meticulous appellate censorship after the fact, provides genuine protection for the rights of the accused without the heavy societal cost of symbolic reversals on grounds unrelated to the guilt or innocence of the accused. *See United States v. Mechanik,* 475 U.S. 66, 72, 106 S.Ct. 938, 942, 89 L.Ed.2d 50 (1986); *Allen, supra,* at 1227–1228.

## IV

## CONCLUSION

For the foregoing reasons, Hunter's conviction is hereby

*Affirmed.*[16]

---

inconsistency before impeaching a defendant with .an omission from a pretrial statement. *See, e.g., Beale v. United States,* 465 A.2d 796, 805 (D.C.1983); *Martin v. United States,* 452 A.2d 360, 363 (D.C.1982); *Sampson v. United States,* 407 A.2d 574, 579 (D.C.1979). In all of these cases, however, the prosecutor sought to *cross-examine* the defendant with an allegedly inconsistent omission from a pretrial statement, and each decision turned on the incontestable principle that, absent a threshold inconsistency, there is nothing to cross-examine the defendant about. Even where cross-examination as to a defendant's silence is concerned, the threshold question for the judge is whether *an impartial jury* could reasonably infer an inconsistency. *Cf. Allen, supra,* at 1232 (concurring opinion), explaining *Hill.* In any event, the cross-examination cases are a far cry indeed from any notion that the prosecutor may refer to the pretrial statement and may mention the trial testimony, but must seal his lips with respect to any comparison between the two, even where the purported comparison is as slight and as dubious as the prosecutor's comment in this case.

12. Although the phrase is a catchy one, we do not agree with Judge Ferren that motions *in limine,* in this or other contexts, require "intuitive foresight bordering on the telepathic."

13. If reasonable jurors could disagree as to whether the defendant's pretrial statement was inconsistent with his trial testimony, counsel should be permitted to argue the question to the jury. *See Dixon, supra,* 565 A.2d at 80 n. 15.

14. *United States v. Cotter,* 60 F.2d 689, 692 (2d Cir.), *cert. denied,* 287 U.S. 666, 53 S.Ct. 291, 77 L.Ed. 575 (1932).

15. EDWARD W. CLEARY, MCCORMICK ON EVIDENCE § 272, at 807–08 (3d ed. 1984).

16. We also disagree with Hunter's contention that the trial judge abused his discretion by giving the jurors an anti-deadlock instruction pursuant to *Winters v. United States,* 317 A.2d 530 (D.C.1974). *See Coleman v. United States,* 515 A.2d 439, 453 (D.C.1986), *cert. denied,* 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 205 (1987);

FERREN, Associate Judge, concurring in part, dissenting in part, and dissenting from the judgment:

## I.

I concur wholeheartedly in the majority's conclusion in Part II.A. that the prosecutor implicitly—and improperly—argued to the jury that Hunter's trial testimony was incredible because Hunter had failed to tell the government after indictment, before trial, "how this [criminal charge] all came about." But Hunter has made another valid contention the majority rejects. The prosecutor did not merely chastise Hunter in front of the jury for failing to tell his entire story to the government after indictment. During the same part of the closing argument the majority criticizes, the prosecutor also impermissibly berated Hunter for failing to tell the police before trial all the exculpatory details he gave during his testimony at trial.[1]

The prosecutor's closing argument had one unifying theme—appellant was not credible—which was emphasized to the jury at the beginning of his argument: "Now we're in a credibility case, obviously." The prosecutor then attacked appellant's credibility at every step of the case, from arrest, to indictment, through the end of trial when appellant finally testified and told his full story. This is "the context of the case as a whole," *ante* at 146, in which we must view the prosecutor's offending remarks.

The prosecutor made his improper comments near the beginning of his closing argument when a jury's attention is at its highest:

How did this case start with the Government, with the D.C. Police? Okay....

At 3:50 [on the morning of Hunter's arrest], on the first rights card talked to by Detective Fluck, Government's Exhibit No. 1 for identification, you will see that [Hunter] refuses. All right. Now we're in a credibility contest case obviously....

\* \* \* \* \* \*

But how does Mr. Hunter, how does he start off as the man of credibility? ... He doesn't even sign the rights card after being—after being read the rights on the back. And you will get this exhibit if you call for it.

\* \* \* \* \* \*

And here we are on trial day, and Mr. Credibility once again tells us this afternoon, on the last day of trial, that, oh, here's what happened. See, I hit him with the stick, but it was on 3–14–89, but it was between five and six in the evening at [his girlfriend's] house. And it was not as the Government says, at eight in the morning on March 14th; it was later, at five and six p.m. at night.

Now here's a man charged with an indictment. At the time this indictment came down, it's got armed robbery in there....

At that point, appellant raised his second objection during the government's closing argument,[2] which the court overruled without explanation. The prosecutor continued:

And it has an unauthorized use of a vehicle count. Here's somebody charged in an indictment by the District of Columbia grand jury, which normally you would not take lightly. You'd get your-

---

*Epperson v. United States,* 495 A.2d 1170, 1173 (D.C.1985). There is nothing in the record to suggest that the jurors in this case were coerced.

1. Appellant also contended that the government impermissibly commented on the exercise of his Fifth Amendment right to silence contrary to *United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975) and *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). This argument has no merit because appellant waived his *Miranda* rights after arrest when he signed a waiver card and made a brief exculpatory statement to the police. *See Hill v. United*

*States,* 404 A.2d 525, 530–31 (D.C.1979) (per curiam) (once arrestee begins to explain his or her conduct after being informed of right to remain silent, *Hale–Doyle* analysis inapplicable), *cert. denied,* 444 U.S. 1085, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1979).

2. Appellant's first objection during the government's closing argument appears a few paragraphs earlier in the transcript at the point where the prosecutor began to refer to appellant's testimony and to discuss the fact that appellant never told his full story before trial.

self an able lawyer. He has an able lawyer. And, yet, he doesn't tell the Government, *didn't tell the police*, doesn't tell anybody, hey, you don't understand how this all came about.

You know. *We're going to wait to the last day of trial, and then we're going to tell the world, just like I told the world on these cards* [the rights card appellant signed during his interrogation by Officer Fluck] and everything else. It's the same thing.

The prosecutor therefore (1) started off his argument by claiming Hunter should not be believed because he did not sign a rights card; (2) then said Hunter "didn't tell the police" and referenced Hunter's trial testimony on "the last day of trial" (in which he told a much fuller version of his story than the few questions he had answered for Officer Fluck after arrest); and, finally, (3) mentioned, once again, the rights card appellant had eventually signed for Officer Fluck during interrogation. In this way the prosecutor effectively made a powerful argument: that the jury should not believe "Mr. Credibility" because he omitted many important details he obviously would have mentioned—if they were true—in his statement to the police immediately after arrest (and long before indictment) instead of waiting until trial.[3]

The prosecutor's comment on Hunter's failure to elaborate his story to the police, well before indictment and trial, reflects an egregious impropriety similar to the impropriety in commenting on Hunter's failure to tell the government his side of the story after the indictment. But, as elaborated below, this reference to the police also

transgressed an established evidentiary rule, to Hunter's detriment. That rule precludes any comment on omissions from a defendant's pretrial statement that are not materially inconsistent with the defendant's trial testimony. I believe the trial court's failure to correct the two improprieties, at least through appropriate cautionary instructions, amounted to reversible error when viewed together in the context of this case.

## II.

Specifically, the majority errs in three respects: (1) in concluding that the prosecutor did not attempt to impeach Hunter's trial testimony with an omission from his pretrial statement to the police; (2) in failing to recognize that our caselaw requires the trial court to make a threshold ruling of law—before the jury may find as a fact—that a defendant's pretrial omission in a statement to the police is material enough to use in evaluating the defendant's credibility; and (3) in saying that the defense, not the government, has the burden of seeking such a threshold ruling if one is desired.

At trial, Officer Fluck testified that after Hunter's arrest, Hunter initially refused to answer any questions. Later, when Hunter asked the officer what was going to happen to the woman who had been with him when the police stopped him, the officer replied that Hunter would have to waive his rights before he could receive any information. After Hunter had signed a waiver card, Officer Fluck told him that his friend was going to be charged. Hunt-

---

**3.** Judge SCHWELB fails to consider the full context of the prosecutor's argument when he states for the majority that, even in references to the police, "the prosecutor was obviously talking [only] about Hunter's omissions after his indictment." *See ante* at note 8. My colleague is plainly wrong. While criticizing this dissent for a "bizarre reconstruction" of the prosecutor's argument, Judge SCHWELB himself has engaged in selective reconstruction by altogether ignoring that (1) police questioning of Hunter occurred before, not after, indictment; (2) the prosecutor's reference to the police in closing argument was combined with a reference to Hunter's signing a rights card, which, according

to Officer Fluck's testimony, occurred immediately before Hunter gave his brief statement to the police after his arrest—long before indictment; and (3) the prosecutor's argument— "didn't tell the police"—used a past tense, in contrast with the present tense used to characterize Hunter's failure to talk after indictment ("doesn't tell the Government"). Judge SCHWELB's protest to the contrary, the prosecutor's references to Hunter's refusal to sign the rights card clearly reveal that Hunter's statement to the police, with its alleged material omissions, occurred soon after arrest, not after indictment.

er replied that "she didn't have anything to do with it" and that he had paid a "gentleman" forty dollars for the car. The officer asked Hunter for the name of the gentleman, Hunter refused to answer, and then, according to Officer Fluck, "out of the blue I asked him, 'What kind of a stick did you hit him with?' and he answered, 'A broomstick.' " There is no indication in the record that the officer asked Hunter any more questions.

During the discussion about jury instructions among counsel and the court before closing arguments, Hunter's counsel objected to the court's proposal to give instructions on any alleged prior inconsistent statements by Hunter.[4] Counsel argued that Hunter's failure to mention to Officer Fluck the details about his transaction with Stevenson was not a material omission amounting to an inconsistency. The trial court agreed, ruling that because there was no evidence Hunter had known he was being accused of armed robbery at the time he spoke with Officer Fluck, there was no reason why he would have mentioned further details; thus, there was no basis for the jury to question Hunter's credibility on the basis of his pretrial statement to the Officer. When the court asked the prosecutor whether he had anything to say on the matter, he replied in agreement, "I wouldn't ask for the instruction."

During closing argument, however, the prosecutor, in effect, repudiated that agreement, as revealed by the portions of that argument I have highlighted above.

The majority, however—in its first error—denies that the prosecutor commented on Hunter's credibility when he referred to Hunter's failure to tell his story to the police. *Ante* at 147. This view is not only contrary to the clear meaning of the prosecutor's words, quoted above, but also ignores the fact that the government in its brief admitted the prosecutor made such a credibility argument at trial (although it claimed the argument was not improper).

The majority adds, however, that even if the prosecutor did comment on Hunter's statement to Officer Fluck, this was not improper because of an elementary legal principle authorizing impeachment if there is a proper evidentiary ground for it: "[I]n the absence of unusual circumstances, a prosecutor should be permitted to make reasonable comments on, and comparisons between, the defendant's pretrial statement and his trial testimony, provided that the prior statement *is in evidence* and that the prosecutor makes no characterizations unsupported by the record." *Ante* at 148 (emphasis added). But in that statement the majority commits its second error. My colleagues erroneously assume that Hunter's alleged pretrial omission "is in evidence."

If a defendant's pretrial statement to the police does not include all the details of the defendant's trial testimony, the question becomes whether that pretrial statement constitutes a "material omission," amounting to "evidence," which the government can use to impeach the defendant. In *Hill v. United States, supra* note 1, 404 A.2d at 531, this court concluded that the question whether a pretrial omission is a material omission, and thus evidence that the government may argue to the jury, is a question of law. The government has the burden of showing a threshold inconsistency between the pretrial omission and the defendant's later statement at trial, and the trial court is required to make a threshold legal determination that the pretrial omission was material enough to constitute "evidence." *See id.* at 531–32. Only after the trial court makes such a ruling may the government argue the pretrial omission to the jury as evidence bearing on the defendant's credibility. If the alleged omission is not formally in evidence, of course, it may not be used in the prosecutor's closing argument, for it is fundamental that the prosecutor may not argue facts not in evidence or misstate the evidence. *See, e.g., Mills v. United States,* 599 A.2d 775, 785 (D.C.1991).

In sum, an argument to the jury that a defendant's testimony is incredible is permissible only when that argument is a logi-

---

**4.** *See* Criminal Jury Instructions for the District of Columbia, Nos. 1.06, 2.28 (3d ed. 1978).

cal inference from admissible evidence and not just based on the prosecutor's own opinion. *See McGrier v. United States*, 597 A.2d 36, 43 (D.C.1991). The majority, therefore, is far afield of the law in implying that the jury may decide, without permission from the judge, that it is appropriate to consider a defendant's alleged pretrial omission in weighing the credibility of the defendant's trial testimony.

Finally, the majority—committing its third error—reverses the evidentiary burden and states that the defendant, not the government, must raise in advance (presumably with intuitive foresight bordering on the telepathic) the issue of whether "a *potential* argument by the prosecutor regarding an omission from the pretrial statement would create an inconsistency where none exists." *See ante* at 148 (emphasis added). This view ignores the two firmly established requirements that the government has the burden to demonstrate that a pretrial omission is material enough to constitute evidence, and that the court has the duty to make a legal ruling that the omission is material, and thus evidence, before the jury is permitted to hear about it either through witness testimony or in closing argument.

### III.

In any event, had the government attempted to meet its evidentiary burden in this case, the trial court—based upon the evidentiary test for a pretrial omission—could not have allowed Hunter's alleged omission in evidence, and thus the prosecutor would not have been able to impeach Hunter's credibility with the omission in closing argument.

To answer the legal question whether the information appellant did not give Officer Fluck was material enough for impeachment, a court must apply the following standard: if the pretrial statement " 'fails to mention a material circumstance' " which the defendant mentions at trial but which also " 'would have been natural [for the defendant] to mention in the prior statement, the prior statement is sufficiently inconsistent' " to constitute evidence.

*Hill,* 404 A.2d at 531 (quoting McCORMICK ON EVIDENCE, § 835 at 68 (2d ed. 1972); *accord Martin v. United States,* 452 A.2d 360, 363 (D.C.1982); *see Outlaw v. United States,* 604 A.2d 873, 879 (1992); *see also Yoon v. United States,* 594 A.2d 1056, 1058–61 (D.C.1991) (government's use of defendant's omission in statement to police constituted evidence subject to Rule 16 pretrial disclosure requirements).

More specifically, *Hill* requires the following individual determination in each case:

[1] The pretrial statement to be admissible for impeachment purposes should purport to address the facts surrounding the commission of the alleged offense. [2] The prosecutor ... must apprise the trial court of the omitted facts to be relied upon as showing inconsistency and [3] the court must consider whether such facts are sufficiently material that the failure to have mentioned them amounts to inconsistency.

*Hill,* 404 A.2d at 531 (bracketed numbers added). Absent a legal finding of threshold inconsistency, a defendant's prior omission "may not have the probative value which would allow its admission at trial for impeachment purposes." *Martin,* 452 A.2d at 363; *see Outlaw, supra,* at 878.

In applying the *Hill* test, we have concluded on at least four occasions that the government failed to meet its burden of showing that a defendant's (or witness's) prior omission in a pretrial statement was material enough to constitute evidence the government could argue. *See, e.g., Sampson v. United States,* 407 A.2d 574, 579 (D.C.1979); *Martin,* 452 A.2d at 363–64; *Beale v. United States,* 465 A.2d 796, 805 (D.C.1983); *Outlaw, supra,* at 879.

In *Sampson,* for example, the appellant waived his *Miranda* rights and made a brief exculpatory statement simply denying his participation in the crime described to him by the police. 407 A.2d at 579. We concluded that because the appellant had "made to the police a general denial of involvement with and knowledge of the crime but [had] made no statement concerning his whereabouts at the time during

which the crime was committed," the government "failed to establish a threshold inconsistency between appellant's prior statement at the police station and his later alibi defense at trial." *Id.*

Likewise, in *Beale*, the defense at trial was alibi, the appellant knew the nature of the crime at the time the police questioned him, but he did not give a statement concerning events surrounding the crime. We concluded "there is nothing to indicate that it would have been 'natural' for appellant to mention his whereabouts at the time of the [crime] since there is nothing to indicate appellant knew when the [crime] had occurred.... Appellant's omission of his alibi that he was elsewhere at the time of the [crime] from his statement to the police was therefore *not* a circumstance 'it would have been natural to mention.'" 465 A.2d at 805 (quoting *Sampson*, 407 A.2d at 578) (emphasis in original).

We have also applied the *Hill* test and upheld the government's use of a defendant's pretrial material omission to impeach the credibility of the defendant's trial testimony. For example, in *Hill* itself the defendant testified at trial about details supporting his self-defense claim—details he had neglected to mention to the booking detective with whom he voluntarily had conversed about his "self-defense" shooting of the victim. *Hill,* 404 A.2d at 527–28. During cross-examination of the defendant, the trial court accepted the prosecutor's proffered theory for impeachment by omission: The defendant testified on direct that he had heard a shot and then had seen the victim running toward him with a gun; it would have been natural to tell the booking detective about those details, because the defendant had told the detective about other persons having guns. *Id.* at 532.

Similarly, in *Ford v. United States,* 487 A.2d 580 (D.C.1984), the appellant failed to mention during two hours of police questioning after her arrest that she had encountered the murder victim just hours before the victim had been killed, a detail she noted in her testimony at trial. We reasoned that because the appellant knew she was a suspect in a murder investigation, and having told the detective all that she did, it would have been natural to tell him also that she saw [the victim] on the day of his murder. We conclude that there was sufficient inconsistency between that omission and her testimony at trial to make it permissible to allow the jury to determine its significance. *Id.* at 587.

In *Dixon v. United States,* 565 A.2d 72 (D.C.1989), the decision which the majority purports to apply in this case, the police questioned the appellant immediately after she had stabbed her husband to death. In a highly detailed statement in which she described all of the events of that day, she explained that she had "warned her husband that she would stab him if he continued to harass her mother or break up the furniture." *Id.* at 80; *see id.* at 74. At trial, however, she explained that she had stabbed her husband because she was afraid that he would kill her. In his closing argument, the prosecutor contrasted the defendant's trial testimony with her statement on the night she killed her husband that failed to mention such fear. *Id.* at 79. In undertaking a plain error review—which enabled the court to skip over whether or not the government had properly proffered (and the trial court had properly ruled on) whether there was a material omission in the defendant's pretrial statement to the police—the court concluded that "a reasonable assessment of [appellant's] pretrial statement and trial testimony compels the conclusion that there was at least a threshold inconsistency with respect to the role of fear as [appellant's] dominant motivation [for stabbing her husband]." *Id.* at 80. Thus, there was no plain error requiring reversal.

In contrast with *Hill, Ford,* and *Dixon,* in this case Hunter, after arrest, did not volunteer a full statement of the events surrounding his assault of Stevenson with a broomstick and his use of Stevenson's car. Rather, after initially exercising his right to remain silent, he waived that right in order to obtain information about his friend who had also been arrested. He then made a one sentence statement excul-

pating his friend, a one sentence statement claiming that he had paid a gentleman forty dollars for the car, refused to answer Officer Fluck's question about the name of the gentleman, and then—in response to a single question "out of the blue"—admitted that he had hit Stevenson with a broomstick. This brief exchange (which is all we have in the record) is far less substantial than the detailed conversations the defendants in *Hill, Ford,* and *Dixon* had with the police, in which they purported to relate their versions of events. Furthermore, unlike the defendants in *Hill, Ford,* and *Dixon,* who had reason to know of the possible charges against them at the time they gave their statements to the police, in this case there is no evidence the police had informed appellant of the robbery charge before Officer Fluck's minimal questioning.[5] Because of these differences, I believe the facts of this case are more in line with those in *Beale, Sampson, Martin,* and our most recent case, *Outlaw,* in all of which this court concluded that the government had failed to show a threshold inconsistency between a defendant's (or other witness's) prior omission and the testimony at trial.

The majority attempts to distinguish these cases by noting that "the prosecutor sought to *cross-examine* the defendant with an allegedly inconsistent omission from a pretrial statement." *Ante* at note 11. True enough. But the majority then acknowledges that "each decision turned on the incontestable principle that, absent a threshold inconsistency [between a pretrial statement and trial testimony], there is nothing to cross-examine the defendant about." *Id.* If it is "incontestable" that the prosecutor shall not cross-examine about a defendant's pretrial omission unless the judge has ruled that the jury could reasonably find the omission was inconsistent with trial testimony, I see no basis for allowing the prosecutor to stress that omission later, in closing argument, unless the judge has made the kind of threshold rul-

ing that Judge SCHWELB acknowledges is required to allow cross-examination on the subject. The impact of closing argument about a defendant's allegedly inconsistent statement is likely to be even greater on the jury than earlier cross-examination eliciting the supposed inconsistency.

Our cases have established that a defendant's failure to tell the government all the details of his or her story before trial is not *per se* impeachable. Thus, when a defendant tells his or her full story at trial, providing details that were not included in a pretrial statement to the police or to the prosecutor, there is not necessarily a "difference". (as the majority would call it, *ante* at note 10) the prosecutor can exploit to impeach the defendant in cross-examination or closing argument. Only a material "difference" has any relevance to a defendant's credibility. According to the Supreme Court: "If the government fails to establish a threshold inconsistency between silence at the police station and later exculpatory testimony at trial, proof of silence lacks any probative value and must therefore be excluded." *Hale, supra* note 1, 422 U.S. at 176, 95 S.Ct. at 2136.

Three members of this court have recently noted that "[t]he problem with drawing inferences from inaction [such as a pretrial omission] is that in many cases there are plausible explanations for a defendant's failure to act that do not indicate consciousness of guilt." *Allen v. United States,* 603 A.2d 1219, 1231 (D.C.1992) (en banc) (Rogers, C.J., concurring) (citing cases). It is highly prejudicial for the government to argue that a defendant's silence in the face of government accusations is proof of incredibility and therefore guilt. *See Allen,* at 1231. "In such contexts, the court has established special standards to guide the trial court in deciding whether to permit the government to raise such an inference." *Id.* at 1232 (citing *Ford,* 487 A.2d at 585–87). In the case of an alleged pretrial omission, the trial judge must make an

---

5. During discussion with counsel over jury instructions, the trial judge stated: "[T]here is no indication that at the time [appellant] made the statement to the detective about the broom stick that he was informed that he had been accused of committing a robbery to get this vehicle. We don't know whether he was or wasn't, but we don't have any evidence that he was."

evidentiary ruling on whether such omission is material and thus can properly be used by the prosecutor to impeach the defendant. Such an evidentiary ruling is what trial judges do and hardly requires the "metaphysical distinction" the majority erroneously assumes. *See ante* at note 10.

## IV.

In reviewing for reversible error, therefore, this court should have considered not only the prosecutor's impropriety in commenting on Hunter's decision not to talk to the government after indictment, but also the prosecutor's impropriety in commenting on Hunter's decision not to tell the police his full story just after his arrest.

It is interesting to note that, as to the first impropriety, the majority agrees that the prosecutor's argument regarding Hunter's post-indictment silence "was improper in a fundamental way," *ante* at 140, "laden with mischief," *ante* at 143, a "vice" approaching a "constitutional question," *ante* at 143, indeed, "a significant departure from permissible advocacy" having "significant potential for prejudice"—a "reality known to judges and lawyers who participate in our criminal justice system," *ante* at 143–144 (quotation omitted). When we couple this obvious, egregious impropriety with the second impropriety reflecting the prosecutor's effective repudiation—in closing argument—of the agreement among court and counsel that there was no basis for instructing the jury about prior inconsistent statements, we have a situation where defense counsel's alleged failure to object at the right moment or in a subsequent motion for mistrial is virtually beside the point.

A principal purpose of the plain error rule "is to permit trial courts fully to consider issues and thereby avoid potential error." *Williams v. United States*, 382 A.2d 1, 7 n. 12 (D.C.1978). As the majority indicates, however, the trial court should have been clearly aware of the prosecutor's transgressions during closing argument and thus should have acted at least by giving cautionary instructions, without need for further prompting by counsel.

The court's majority, however, affirms after applying the plain error standard because defense counsel did not object "with reasonable specificity" and because this court should not allow litigants to "keep some of their objections in their hip pockets." *Ante* at 144. The majority acknowledges a "relaxed" standard for objections in the context of closing argument since it is well known that a jury may take unkindly to a counsel's interrupting of another's argument to the jury. But the majority implicitly repudiates this standard and applies a new rule of law. Whereas, under our previous decisions, a motion at the bench had been "sufficient" to preserve a point of objection during the opponent's closing argument, *see Irick v. United States*, 565 A.2d 26, 32 n. 13 (D.C.1989), now such a motion may be necessary, not merely sufficient. *See ante* at 145. Thus, Hunter's misfortune is not that his counsel failed to object; it is that his counsel did not object strenuously enough.

After settling on the plain error standard, the majority then decides whether it was "unreasonable" for the trial court not to have intervened given "the lack of any reaction from defense counsel," and whether the trial judge "act[ed] within his discretion" and "could thus reasonably [have] conclude[d] ... that the situation was not extreme enough to warrant his uninvited intrusion into the adversary process." *Ante* at 146 (quotation omitted). Hunter's counsel, however, did react; he registered two objections, the second one of which the trial court summarily "overruled." Because the prosecutor was talking about Hunter's credibility in the context of his trial testimony and indictment, surely the government and trial judge should have been on notice that Hunter thought the government was improperly impeaching him.

Under the circumstances, to say that defense counsel objected too few times by failing to register still another objection immediately after the prosecutor completed the sentence to which counsel had objected, or that counsel was required to make a motion at the bench, is cutting the harm-

less error rule awfully fine. "An objection to evidence, once made and overruled, need not be renewed to the same type of evidence subsequently received." *Wilkins v. United States*, 582 A.2d 939, 942, n. 7 (D.C.1990) (citing E. CLEARY, McCORMICK ON EVIDENCE § 52 at 132 (3d ed. 1984)). Unlike the majority, I would be willing to apply harmless error analysis here, even though counsel—for whatever reason—did not flesh out the objection by adding this particular prosecutorial misconduct to the grounds for mistrial proffered later. The trial court effectively was (or should have been) on notice of the problems.

In his closing, the prosecutor argued, improperly, against Hunter's credibility because Hunter did not tell the police or government his full version of events until trial. Because each side told a completely different version of events, the most significant determination for the jury was to decide who was most credible: the government's complaining witness (Stevenson) or Hunter. Just how difficult the decision was for the jury is demonstrated by the fact that the jury found Hunter not guilty of the armed robbery charge but remained deadlocked for two days over the unauthorized use of a vehicle charge. It was only after the court read the jury an anti-deadlock instruction that it was able to return a guilty verdict on that charge. The government substantially relied on its specious argument that Hunter's trial testimony was incredible because he told neither the police nor the government his full story before trial; whether or not the jury believed Hunter's story was the critical factor in the jury's decision. *See Outlaw, supra,* at 880–881 (when trial court erroneously allows government to impeach witness with prior omission that is not material, and impeachment bears directly on guilt or innocence, even cautionary instruction not enough to rectify error).

Given the substantial prosecutorial misconduct in a case turning on witness—especially the defendant's—credibility, and further given that the prosecutor had even agreed with the trial court, during discussions about jury instructions, that there was no legitimate basis for claiming Hunt-

er had made a prior inconsistent statement, I think there clearly was plain error affecting Hunter's substantial rights. I would reverse and remand for a new trial.

Respectfully, therefore, I dissent.